UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

VICTOR MONES CORO,

                *Defendant*.

S4 19 Cr. 144 (AKH)

**<u>REPLY SENTENCING MEMORANDUM OF DEFENDANT VICTOR MONES CORO</u>**

CHRISTINE H. CHUNG PLLC
Christine H. Chung
14 Murray Street, #236
New York, New York 10007
(917) 685-0423

PERRY GUHA LLP
Samidh Guha
George M. Barchini
35 East 62nd Street
New York, New York 10065
(917) 674-5383

Attorneys for Victor Mones Coro

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT .............................................................................................................................3

I.    The Government Improperly Urges The Corruption And Crimes Of The
      Venezuelan Government, And Others, As A Basis For Punishing Mr.
      Mones....................................................................................................................................3

II.   The Government Fails To Refute That An Unwarranted Disparity Would
      Result Were a Sentence of Longer than 28 Months' Imprisonment
      Imposed..................................................................................................................................7

III.  Mr. Mones Has Accepted Responsibility For What He Did But The
      Government Greatly Overstates His Role.........................................................................11

      A.    Mr. Mones Has Long Admitted The Conduct In Which He
            Engaged.....................................................................................................................11

      B.    Mr. Mones Was A Service Provider, Not A Leader or Organizer........................15

IV.   Mr. Mones' Crimes Must Be Considered In The Context Of His Life And
      Other Mitigating Factors ...................................................................................................19

      A.    Mr. Mones Has Led An Otherwise Honorable Life and Will Never
            Again Commit a Crime............................................................................................20

      B.    ██████████████████████████████
            Shows He Was Not Disloyal To The U.S. And Did Not Undermine
            U.S. Interests ............................................................................................................21

      C.    The Extreme Conditions Of Mr. Mones' Confinement, And His
            Model Conduct As An Inmate, Weigh In Favor Of Leniency..............................23

      D.    Mr. Mones' Help In Exposing Mr. Marin Supports A Downward
            Variance ....................................................................................................................24

      E.    Extraordinary Burdens Have Already Been Imposed By The
            Government's Late Discovery Productions ...........................................................25

V.    No Fine Should Be Imposed ...............................................................................................26

CONCLUSION.............................................................................................................................27

**Cases**

*United State v. Toohey*,
132 F. App'x 883 (2d Cir. 2005) .........................................................................10

*United States v. Adelson*,
441 F. Supp. 2d 506 (S.D.N.Y. 2006).................................................................20

*United States v. Ashubi*,
No. 07 CR. 1008-01 RWS, 2008 WL 4449340 (S.D.N.Y. Oct. 1, 2008)..............19

*United States v. Atilla*,
No. 15-cr-867-RMB, 2018 WL 791348 (S.D.N.Y. Feb. 7, 2018) ..........................7

*United States v. Atilla*,
No. 15-cr-867-RMB (S.D.N.Y. May 16, 2018), ECF No. 520 (Sent. Tr.) ..................... *passim*

*United States v. Booker*,
543 U.S. 220 (2005)...........................................................................................27

*United States v. Burgos*,
324 F.3d 88 (2d Cir. 2003)..................................................................................19

*United States v. Camacho*,
No. 13 Cr. 58, 2021 WL 260122 (S.D.N.Y. Jan. 26, 2021)..................................24

*United States v. Darge*,
No. 10 Cr. 863, 2020 WL 3578149 (S.D.N.Y. July 1, 2020) ...............................24

*United States v. DeRiggi*,
72 F.3d 7 (2d Cir. 1995)......................................................................................18

*United States v. Duncan*,
42 F.3d 97 (2d Cir. 1994)....................................................................................18

*United States v. Fernandez*,
443 F. 3d 19 (2d Cir. 2006).................................................................................21

*United States v. Greer*,
285 F.3d 158 (2d Cir. 2002)................................................................................15

*United States v. Huerta*,
371 F.3d 88 (2d Cir. 2004)..................................................................................18

*United States v. Shih*,
    No. 11 cr. 119 (JEB) (D.D.C. May 2, 2012), ECF. No. 60 (Sent. Tr.) ...................................11

*United States v. Murad*,
    954 F. Supp. 772 (D. Vt. 1997).........................................................................................18

*United States v. Phillips*,
    No. 1:11-cr-00757-SJ (E.D.N.Y. June 13, 2012), ECF No. 20 (Gov't Sent.
    Ltr.) ...............................................................................................................................9, 10

*United States v. Nejad*,
    No. 1:18-cr-00244-AKN (S.D.N.Y. Feb. 22, 2021), ECF No. 399 (Opinion
    and Order) .....................................................................................................................2, 25

*United States v. Sarvestani*,
    297 F.R.D. 228 (S.D.N.Y. 2014) .......................................................................................11

*United States v. Sarvestani*,
    No. 13-cr-214-PGG (S.D.N.Y.) ECF No. 45 (Sent. Tr.) .................................................10, 11

*United States v. Spencer*,
    129 F.3d 246 (2d Cir. 1997)................................................................................................18

*United States v. Weaver*,
    716 F.3d 439 (7th Cir. 2013) ..............................................................................................18

*United States v. Wisniewski*,
    121 F.3d 54 (2d Cir. 1997) (*per curiam*) ...........................................................................18

*United States v. Zubiate*,
    No. 18-cr-442, 2020 WL 312788 (S.D.N.Y. June 12, 2020).............................................24

## Statutes

18 U.S.C. § 371 .......................................................................................................................11

18 U.S.C. § 3553(a) ............................................................................................................24, 27

## Sentencing Guidelines

U.S.S.G. § 2M5.1 ......................................................................................................................7

U.S.S.G. § 3B1.1 ..........................................................................................................17, 18, 19

U.S.S.G. § 5K1.1 .....................................................................................................................21

**<u>Other Authorities</u>**

Hon. Raymond Dearie, *Retool Mandatory Sentences*, New York L.J. (June 24, 2016), ............................................................................................................27

## PRELIMINARY STATEMENT

The government quietly concedes that there is no precedent for the charging and sentencing positions it has taken in its case against Victor Mones Coro—a single service provider based in Florida to whom the government tries to link Nicolas Maduro's persistent hold on power as well as crimes and terrorism well beyond Venezuela.  The government then doubles down by seeking to have the Court to validate the clear disparateness of the Guidelines sentence it advocates.  Mr. Mones should be sentenced to 28 months' imprisonment, in line with the average in the most serious kind of sanctions cases (those involving Iran), with the USPO's recommendation of 30 months' imprisonment, and with the multiple unique mitigating factors in this case.[1]  Even the government fails to find an example supporting the 70-month sentence it recommends other than a single case in which the defendant was in CHC VI.

The government betrays its loss of perspective most clearly when it reduces the first 50 years of a law-abiding life and countless acts of kindness and charity to one sentence—in which it implies that dozens of obviously sincere letters of support for Mr. Mones could only have been "marshal[led]" by deployment of charm or manipulation.  Government Sentencing Memorandum, ECF No. 185 ("G. Br."), at 38.  Among other things, the insinuation lacks any basis in fact.  Mr. Mones has long admitted his crimes and the ugly things he did in the course of committing them.  But the one-sided government view—that *nothing* in Mr. Mones' life of his case supports any measure of leniency, while *every one* of the government's own failings and derelictions should be excused and without consequence—predictably relies on factual and legal overstatement.

---

[1] Short forms like "USPO" are the same as in Mr. Mones' opening sentencing memorandum.

Far from having evidence, for example, that Mr. Mones was motivated by fealty to Maduro or the desire to facilitate any crime other than the sanctions evasion he has admitted, the government knows the contrary—███████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████. And Mr. Mones—a flight services broker—cannot accurately be re-cast as the "mastermind" and "architect" (*id.* at 2, 43) who "did not take orders or direction from [lead defendants] El Aissami or Lopez Bello" (*id.* at 29), to shoehorn Mr. Mones into a leadership enhancement. The assertion that Mr. Mones' crimes meaningfully contributed to the threat posed by Maduro or any other international politician or criminal (*id.* at 32-33) disregards that Mr. Mones provided a non-unique service that the lead defendants could—and did—obtain from brokers other than Mr. Mones, including ones outside the U.S. not bound by U.S. sanctions.

The government's duty is not to prevail in every case, or on every point. *See* Opinion & Order, *United States v. Nejad*, 18 Cr. 244 (AKN) (Feb. 22, 2021) ("*Nejad* Op."), at 16 (government's first duty is to "ensure 'that justice shall be done'") (quoting *Berger v. United States*, 295 U.S. 78,99 (1935)). It is not to nurse wounds, *id.* (government should "own[]" and "rectify[]" its own mistakes), or single out for punishment the defendant who was easily arrested and promptly accepted responsibility. The government well knows that the misconduct in this case, however serious, can never be credibly cast as worse or more consequential than in *United States v. Atilla*, in which the defendant was sentenced to 32 months' imprisonment after a trial at which it was proved that he transferred billions in proceeds of the Iranian petroleum industry for over five years, materially worsening Iran's nuclear threat. It should not claim to be confused about how its 16 late discovery productions could have burdened a defendant, deny the worth of Mr. Mones' help in exposing its Confidential Source as a liar, or use the number of defense counsel

a defendant has had as proof that a "substantial" fine is warranted. Its "take no quarter" approach goes too far.

Mr. Mones is deeply remorseful for his crimes and extremely grateful to the Court for conducting an in-person sentencing proceeding at which he will be able to address the Court. He respectfully requests imposition of a sentence that will enable him to return to the support of his friends and family and to re-set and rebuild his life after the two years of very hard time he has already served.

## ARGUMENT

I.   **The Government Improperly Urges The Corruption And Crimes Of The Venezuelan Government, And Others, As A Basis For Punishing Mr. Mones**

The sole crime of Mr. Mones was providing from his U.S.-based sole proprietorship, for two years, the service of brokering of air passenger flights. But for 20 odd pages of its brief, the government recites the history of Venezuela's "ruling kleptocracy" (G. Br. at 3), the "heinous extrajudicial killings" committed by Maduro and his regime (*id.*), the "humanitarian crisis" in Venezuela (*id.* at 33), the "infamous" narcotics trafficking of El Aissami and his purported support for terrorist organizations including Hizballah (*id.* at 4), El Aissami's facilitation of drug shipments to a violent Mexican drug cartel and providing of protection to Colombian drug lords (*id.* at 5), Maduro's conducting of a sham election in early 2018 (*id.* at 2), and El Aissami's role in managing Venezuelan oil assets (*id.* at 18).

The government goes further, saying explicitly that Mr. Mones' "longstanding relationships" with his co-defendants and other Venezuelan clients alone should result in a "serious incarceratory sentence." *Id*. at 33. It argues that Mr. Mones' conduct "worsened" the national emergency to U.S. interests addressed by the sanctions laws. *Id*. at 32-33.

Mr. Mones fully agrees that he committed serious crimes and that his disregard of the possible effects of those crimes was inexcusable. But it is undisputed that he did not facilitate narcotics trafficking, engage in money laundering, or illegally ferry contraband or cash. The government has never argued that Mr. Mones is a danger to the community. And in a case where practically every hour of the conspiracy is documented in emails and texts, there is no proof that Mr. Mones ever met Maduro or knew anything about crimes other than the sanctions evasion conspiracy in which he participated.

*Dissociation* was Mr. Mones' failing, not intent to associate with crimes other than sanctions evasion. Mr. Mones helped Venezuelan nationals by donating food, money, and personal goods to churches, orphanages, and friends and relatives; he was by no means a follower of geopolitics. He had no love for the Maduro regime and felt glad and lucky to have been able to leave Venezuela, twenty years ago, after his wife and his elder daughter were attacked on a Caracas street. He was not reading Interfax or any other source to learn why his clients were flying where they did or with whom they were meeting. His goal was to recoup the money his clients owed him and his focus on fulfilling their requests to get them to where they wanted to go.

The government's attribution of guilt by association also goes beyond the facts and fairness. Mr. Mones has met El Aissami once in his life, and El Aissami always sought brokering services from Mr. Mones through one or another of his subordinates, like Joselit Ramirez Camacho (whom Mr. Mones also has met only once). Mr. Mones has never even texted with El Aissami. The reason the government seizes on a single string of texts in which Mr. Mones agreed when Ramirez Camacho asked him to arrange flights during Maduro's 2018 presidential campaign (G. Br. at 11-12, 30), is that there is no other communication showing that any of Mr. Mones' co-

4

defendants discussed their business or political activities or objectives with Mr. Mones.  For Mr. Mones to "yes" his clients was routine and what service providers do.

The claim that Mr. Mones' "relationships" should be punished (*id*. at 33) is particularly disingenuous given that ███████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

---

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

The notion that Mr. Mones "worsened" any of the crimes or corruption on which the government dwells (G. Br. at 32-33), or that his crimes affected Maduro's victory in an uncontested and undoubtedly rigged election (*id*. at 37), also overstates Mr. Mones' importance. This is not a case in which the defendant violated U.S. sanctions by providing a unique good or performing a unique service. Every flight that Mr. Mones brokered is one that El Aissami or Lopez Bello could have ordered—legally—from another broker based outside the United States. They in fact did use other brokers.[3] Had Mr. Mones never opened or operated ACS, El Aissami, Maduro, and/or the Venezuelan government would be in no different position than they are today.

The government states that, at a minimum, Mr. Mones' "relationships" are "factually accurate and necessary context." *Id*. at 23. But nothing about that "context" is proven, even by a preponderance of the evidence. Instead, the government relies on allegations in OFAC notices and indictments and media reports. *Id.* To date the government has shied from even charging El Aissami or Lopez Bello with narcotics trafficking, despite having superseded the indictments in this very case in March 2019, to great fanfare and fully two years after OFAC designated the pair to be narcotics traffickers. *See* Fifth Superseding Indictment, ECF No. 67.

There is nothing inconsistent, moreover (G. Br. at 23), in Mr. Mones' having served El Aissami and Lopez Bello since 2014 and not knowing of the crimes and bad acts the government

---

[3] Among other brokers referenced in the chats and documents are JetMar, Journey, Windsor Jet, CharterWings, Helidosa, and MNG.

catalogs. No sanctions law made Mr. Mones' provision of services to his co-defendants illegal before February 2017; those relationships were legal. And the government has no proof that Mr. Mones knew of any illegality being committed by his co-defendants (other than the sanctions evasion) at any time. An OFAC notice dated February 13, 2017, media reporting thereafter, or indictments returned last year alleging narcotics trafficking by Maduro in the 2000's, are not relevant to Mr. Mones' state of mind before 2017. These sources leave unchanged that Mr. Mones did not meet El Aissami or Lopez Bello until 2014 and has never met or dealt with Maduro.

The government's effort to tar Mr. Mones by "association" is unfair and unsupported.

## II.   The Government Fails To Refute That An Unwarranted Disparity Would Result Were a Sentence of Longer than 28 Months' Imprisonment Imposed

Importantly, the "context" into which the government attempts to put Mr. Mones' evasion is "context" that can be advanced in most sanctions cases. The premise of Section 2M5.1, and the reason for its inexactness and lack of gradation, is that a violation of "national security controls" has triggered its applicability. *See* U.S.S.G. § 2M5.1(a)(1). Thus, in *Atilla*, where Iran sanctions were violated, the government used the same playbook at sentencing, armed with "context" far more serious than here. Mr. Atilla, a deputy manager at Halkbank, a Turkish state bank, had for five years directed billions in sanctions-violating money transfers, gone to trial, lied at trial, been convicted of money laundering and bank fraud as well as sanctions evasion, and lied to senior Treasury Department officials during the conspiracy.[4] The government called the "scope and scale" of Mr. Atilla's crimes "massive" and the case the "biggest sanctions evasion case" ever prosecuted. *Atilla* -Tr.-at 72:16.

---

[4] Sentencing Transcript (*"Atilla* Tr.") at 12:8-12, 13:5-19:13, 25:2-5, *United States v. Atilla*, No. 15-cr-867-RMB (S.D.N.Y. May 16, 2018), ECF No. 520; *United States v. Atilla*, No. 15-cr-867-RMB, 2018 WL 791348, at *1 (S.D.N.Y. Feb. 7, 2018).

The government also argued at sentencing that the Iran sanctions targeted:

> a dangerous regime with globally significant activity, grave human rights violations, a long history of support and funding for foreign terrorist organizations, and acts of terrorism, an illicit ballistics missile program, and an illicit military nuclear program. That . . . is, in a very real sense, a case about nuclear capability. Nuclear capability by the world's foremost state sponsor of terrorism.

> This [*i.e.*, Mr. Atilla's conduct] is activity that happened contemporaneously with the adoption and implementation of those sanctions, contemporaneously with a sustained and coordinated international effort to try and get Iran to stop that military nuclear program.

> And it undermined those negotiations and those efforts in a way that was both big, monumental in scope, and momentous in timing.

*Id.* at 72:22-73:18. The Court nonetheless determined it appropriate to depart from a Guidelines range of 97-121 months to impose a sentence of 32 months' imprisonment, based on multiple mitigating factors, including an otherwise blameless life, that apply equally to Mr. Mones. *Id.* at 20:22-25, 29:25-30:5, 36:22-24, 37:23-38:3, 46:22-25.

The government does not justify the disparity that would be created by imposing a sentence of 70 months' imprisonment on Mr. Mones, given the sentence imposed in *Atilla* and other cases with far worse conduct. The government also does not dispute that no one before Mr. Mones has been charged for violating the Kingpin Act without also being charged with narcotics trafficking or money laundering. It also does not disprove that the government rarely seeks any kind of role enhancement in a sanctions evasion case (G. Br. at 27), and that no court in the last five years has imposed a four-level enhancement in any Iran sanctions evasion case. This despite the fact that sanctions defendants often are leaders in a company (or more than one), participate in multi-member cross-border conspiracies, and engage in lying and deceit, including to government officials.

Mr. Mones made a systematic showing of disparateness, with a fully explained methodology of setting forth sentences imposed in a five-year period, across the country, in Iran sanctions cases, after having eliminated cooperators and where sufficient information about the sentencing was available. Ex. 1 to D. Br. at 1 (stating criteria of survey); D. Br. at n.26 (same). The reason for the systematic survey was precisely to remedy that no small sample of cases can be expected to account for case-to-case variation. All the defendants in the survey turned out to be, like Mr. Mones, first-time offenders and thus in CHC I. The average of the surveyed sentences was 28.9 months, with downward variances in 20 of the 23 cases (or more than 87% of cases).

In the face of this showing, the government cited seven cases anecdotally. G. Br. at 41. One is a 25-year-old case in which the defendant violated sanctions against Libya and went to trial. G. Br. at 41 (citing *United States v. McKeeve*). The other six involved sentences imposed in Iran sanctions cases between 2011 to 2013 and therefore outside the five-year time frame of the defense survey. *Id.* In *United States v. Phillips*, in which the defendant was sentenced to 92 months' imprisonment, the CHC was VI.[5] In the other six cases the sentences averaged 49.2 months. In other words, even the government's biased survey yields an average sentence of more than 20 months *below* the bottom end of the Guidelines range of 70 to 87 months' imprisonment the government seeks for Mr. Mones.

A *systematic* ten-year survey yields a far lower average—almost exactly the same average sentence as in the five-year survey. D. Br. at 3, 24. As Mr. Mones' opening brief mentioned, (D. Br. at n.26), counsel had also conducted a ten-year survey, and a chart of the results of that survey is annexed hereto as Exhibit 11. The average sentence of the 45 cases that fell within the

---

[5] Government Sentencing Letter, *United States v. Phillips*, No. 1:11-cr-00757-SJ (E.D.N.Y. June 13, 2012), ECF No. 20, at 1, 5.

parameters of the ten-year survey[6] was 29.0 months. Downward variances were granted in 38 of the 45 cases (or 84% of the time), and the average downward variance was almost 28 months. In only three of the 45 cases was any role enhancement imposed. *See* Ex. 11, Rows 7, 22 (two-level enhancements). The sole leadership enhancement was imposed after trial convictions for sanctions evasion, money laundering, and obstruction of bankruptcy proceedings, in connection with a seven-year scheme to export technology to help Iran develop low-earth orbiting satellites. *Id*. at Row 33.[7]

Because there is a duty to evaluate disparateness, *e.g.*, *United State v. Toohey*, 132 F. App'x 883, 887 (2d Cir. 2005) (vacating and remanding for failure to consider nationwide disparities), the government's insistence on a sentence of at least 70 months' imprisonment is misplaced. In addition to ignoring *Atilla*, the government now describes *United States v. Sarvestani*, No. 13-cr-214-PGG (S.D.N.Y.), in ways that bear no resemblance to how the government itself described that case at sentencing. The government emphasizes that the satellite equipment defendant Sarvestani furnished to Iranian companies was worth only several hundred thousand dollars (G. Br. at 42), leaving out that Judge Gardephe, at the government's urging, found Sarvestani to be a "highly sophisticated" businessman who operated in multiple countries and partly owned two companies, one of which made $200 million in one year alone. Sentencing Transcript ("*Sarvestani* Tr.") at 22:22-23:4, *United States v. Sarvestani*, No. 13-cr-214-PGG (S.D.N.Y. Aug. 14, 2013),

---

[6] The ten-year survey included four of the six Iran sanctions cases referenced by the government; *Phillips* and *United States v. Arsalan Shemirani* were excluded because counsel were unable to obtain the sentencing transcripts or sufficient substitute information. It appears that Shemirani may have been a cooperator, in which case he would have been excluded from the defense survey by its conservative criteria in any event.

[7] Materials underlying either survey can be made available to the Court.

ECF No. 45. Sarvestani had no need to profit from crime, he had been warned of the illegality of his conduct in writing, and he encouraged his employees to lie to U.S. customs inspectors. *Id.* at 22:22-23:11. The Guidelines range was 57-60 months' imprisonment because the government had let Sarvestani plead to a single count of 18 U.S.C. §371.[8] Judge Gardephe nonetheless downwardly varied 27 months from the bottom of that range to impose a sentence of 30 months' imprisonment and a $100,000 fine. *Sarvestani* Tr. at 31:4-7.

By accepting responsibility and pleading guilty to a set of unprecedented Kingpin Act charges, Mr. Mones has already sent a strong signal and deterrent to other potential wrongdoers. *See* Exhibit 12 (media coverage of this case). Courts routinely take into account comparative sentences in sanctions cases, finding that the possible variations from case to case are overcome at the point when a consensus emerges. *Sarvestani* Tr. at 27:8-19; Sentencing Transcript ("*Shih* Tr.") at 43:18-44:3, *United States v. Shih*, No. 11 cr. 119 (JEB) (D.D.C. May 2, 2012), ECF. No. 60 (noting importance of "impos[ing] a sentence that is consistent with other sentences in this field" and commending parties for bringing up "very important considerations concerning similar types of cases"). A sentence of 28 months' imprisonment avoids impermissible unwarranted disparity.

## III. Mr. Mones Has Accepted Responsibility For What He Did But The Government Greatly Overstates His Role

### A. Mr. Mones Has Long Admitted The Conduct In Which He Engaged

When discussing Mr. Mones' conduct, as opposed to that of international criminals Mr. Mones has never had dealings with, the government predictably highlights and dwells on his worst

---

[8] *Id.* at 4:3-6, 4:16-18; *United States v. Sarvestani*, 297 F.R.D. 228, 229 (S.D.N.Y. 2014). Prosecutors made the same agreement in about half the cases in Exhibit 11. In more than a third of the cases, prosecutors agreed that a below-Guidelines range was warranted, or sought only a below-Guidelines range sentence.

moments and worst concealment activity. But there is no "gotcha" here. Mr. Mones has consistently admitted, since he first pled guilty in November 2019, any misconduct in which he engaged. He has no interest in denying anything he did. As the surveyed cases show, sanctions crimes routinely involve deception, false documentation, lying, and subterfuge. Mr. Mones promptly admitted engaging in this misconduct as well.

When the PSR that followed his first guilty plea was being prepared, ECF No. 64 (the "March 2020 PSR"), Mr. Mones agreed to many incriminating facts and thus jointly proposed with the government to have included in the March 2020 PSR:[9]

- That after El Aissami and Lopez Bello were designated in February 2017, he continued to broker flights for them, knowing that it was illegal to do so without first obtaining a license (March 2020 PSR at ¶¶ 17, 21, 26, 28, 37-38, 40);

- That he, Mr. Marin, and Leon tried to avoid detection by brokering flights for the designees only to and from destinations outside the United States (*id.* at ¶ 28);

- That he and Leon deliberately stopped listing Lopez Bello and El Aissami on passenger manifests and internal records created by ACS after OFAC's designations (*id*. at ¶ 38);

- That he was paid by wire transfers from companies designated by Lopez Bello but not identifiable as affiliated with Lopez Bello (*id.*);

- That he was also paid with cash that Leon and Journey Aviation brought into the country (*id.*) [This cash was declared and thus legally transported, to Mr. Mones' knowledge, and the PSR does not say otherwise];

- That in a call recorded by Mr. Marin on January 11, 2018, Mr. Mones discussed the possibility of flying bulk cash illegally into the United States to pay Lopez Bello's debt (*id.* ¶ 30) [As the government acknowledges (G. Br. at 10 n.12), Mr. Mones never followed through, nor did he help execute the illegal bulk cash transfers of millions of euros later carried out by El Aissami with Leon and Mr. Marin (*id. at* 19)];

---

[9] *See* March 2020 PSR at p. 26 ("As agreed to by the parties, Paragraphs 18 through 43 and 55 have been revised and/or corrected.").

- That between February and May 2018, Mr. Mones and Leon arranged between 20 to 25 domestic Venezuelan flights on behalf of El Aissami and Lopez Bello for Maduro's 2018 presidential campaign (March 2020 PSR at ¶ 40);

- That on August 28, 2018, in a call made by Orsini Quintero and recorded by the case agents, Mr. Mones suggested that Orsini Quintero play dumb and tell law enforcement that he had not flown in a while and avoid connecting one person to another (*id*. at ¶ 39);

- That just before his arrest, in March 2019, Mr. Mones brokered travel services for a trip made by Lopez Bello from the Dominican Republic to Turkey and Russia (*id*. at ¶ 37).

The government's brief thus presents as argument misconduct for which Mr. Mones accepted responsibility long ago. It was not previously discussed between the parties, but Mr. Mones also does not dispute that he brokered flights for Mikael Moreno before and after he was sanctioned.

Mr. Mones does not agree that the government has accurately identified lies in his post-arrest statement,[10] or that he was in the main untruthful during his hour-long post arrest statement. But again he will not quibble because he did lie, for example, about having never met El Aissami or Ramirez Camacho when in fact he had met each of them once.

Mr. Mones has thus never turned away from admitting his offenses and misconduct. Still, the government's method of focusing on particular events, documents, and texts also inevitably misses at least part of the forest for the trees.

For example, the government has submitted as an exhibit *one* of the scores of chat chains (encrypted and not) used by the defendants. Ex. B to G. Br. Mr. Mones undoubtedly assented when Ramirez Camacho asked him to arrange flights relating to the 2018 election or to find El Aissami a flight to Turkey and Russia in early 2019. But the same chat chain makes clear that Mr. Mones was continually asking for "some help from [Ramirez Camacho]," in collecting the millions

---

[10] The post-arrest statement lasted for about an hour. As is often the case, the questions and answers sometimes overlapped and Mr. Mones tended to say "yeah" either to indicate he understood the question or to indicate agreement.

that the designees owed him because of Mr. Mones' practice of advancing to operators the costs of the flights. *See Id.* at 2-4 (Mr. Mones' response to "how much is owed" with "about 7"). Mr. Mones pleads to Ramirez Camacho that he is "teetering on the edge" (*see id.* at 12), and cannot remain "operational" absent payment. *Id.* at 45. Unsurprisingly given the power dynamic, Mr. Mones' tone is apologetic; he cautiously requests for payments to be sent "little by little" and in "any way possible." *See e.g., id.* at 4, 6, 42 ("And sorry for the insistence, brother, you know that I'm always moving ahead but I am in a critical state by now.").

A chain in which Mr. Mones was trying to collect funds from Gilberto Morales, one of the intermediaries used by Lopez Bello, likewise demonstrates that Mr. Mones' bosses were happy to put Mr. Mones off and continue flying for free. When Mr. Mones asks for "a hand with the other thing" (Ex. 13 at 146), in early May 2018, Morales responds, "I don't have any way to at this time," and "I'm stuck." (*id.*). When Mr. Mones asked again in June for the millions, saying "partner, I need a hand," quickly adding, "I know you are [working] on that," Morales responded, "you have to be patient." *Id.* at 159. In July, Mr. Mones sent Morales the following self-depiction:



*Id.* at 13. But Morales countered, "Now I don't even have a bank." *Id.* at 165). What Mr. Mones did not know is that at the same time, and as established by other chat chains, El Aissami was arranging through intermediaries in Venezuela (including Juan Ferro and Ramirez Camacho), for Leon and Mr. Marin to receive nearly 1.3 million euros in bulk cash, to be illegally flown into the United States by Mr. Marin, without Mr. Mones' knowledge or participation. Complaint, *United States v. Marin*, No. 20 MAG 9491 (S.D.N.Y. Sept. 4, 2020), at ¶ 5(c) & (f); G. Br. at 19.

Mr. Mones is not saying that financial gain is a good reason to commit crimes. But the full record of the case shows that the OFAC designees had huge leverage on Mr. Mones, and kept him at their beck and call, even while picking and choosing when to pay him and when to use his services. Ramirez Camacho in fact withdrew his request that Mr. Mones help arrange a flight for El Aissami to Russia in January 2019, just after Mr. Mones learned through another broker that El Aissami had sought the same flight through three brokers other than himself. Ex. 14 at 1-2 (January 28, 2019 email from Journey Aviation stating "3 more brokers looking for same trip to Moscow," before Mr. Mones replies that "Apparently they postponed the trip."). Mr. Mones *never* brokered a flight for El Aissami to Russia.

While the government bristles at it, the description of Mr. Mones as a limo driver or transport arranger is fully substantiated from the contemporaneous documents and communications. Mr. Mones was utterly focused, minute to minute, on satisfying his clients and asking them to make him whole. He had no motive worse than trying to avoid losing his company, although he made a terrible error in thinking that he could quickly extricate himself from dealing with the designees, and in trusting that his clients would care about paying him.

## B.    Mr. Mones Was A Service Provider, Not A Leader or Organizer

The government most sharply departs from facts, and even common sense, in seeking the four-level role enhancement. In the government's new description of Mr. Mones, he is the "chief architect," "principal orchestrator" and "quarterback" of the evasion conspiracy (G. Br. at 30, 32, 43) who "did *not* take orders or direction from El Aissami or Lopez Bello" (*id.* at 29 (emphasis supplied); *see also id*. at 43 ("Mones was not following orders but giving them")).

This simply turns the conspiracy on its head and exposes the *in*aptness of applying the enhancement. *See United States v. Greer*, 285 F.3d 158, 181-82 (2d Cir. 2002) (noting that the

defendant's role should be judged vis-à-vis relevant conduct and holding that, in a drug conspiracy headed by Dutch and Canadian groups, the court properly regarded defendants in U.S. as "simply middlemen"). According to the indictments in this case, and its own lengthy narrative about the crimes and misconduct of Venezuelan government officials and their alleged "front men," El Aissami, Lopez Bello, and Ramirez Camacho are the powerful figures sitting in Venezuela atop the hierarchy of the sanctions evasion conspiracy, and who paid Mr. Mones, Leon, and others for "flight related services," and reaped the benefits of the services provided. Consistently with the indictments, the government agrees that Mr. Mones provided "brokering" services. G. Br. at 6, 17; Feb. 2021 PSR at ¶¶ 12, 17, 32, 40, 41.

Now the government redraws the conspiracy to put Mr. Mones, the broker or middleman, at the top of the heap, and characterizes the lead defendants as subordinate to Mr. Mones. The government's revision is depicted as follows:



This outcome-driven departure from truth should be rejected. The OFAC designees "designed" the scheme, deciding which brokers to use, where and how they wanted to travel, and which of their front companies would make payments. The services benefitted the Venezuelan clients, not Mr. Mones, since Mr. Mones pre-paid the often staggering costs of the flights and often lost even his 10 to 20% brokering commission.

Entire chat chains are devoted to the orders placed by the lead defendants or their associates in Venezuela—wherein the clients specified dates, destinations, passengers, and often aircraft and even pilot.[11] The designees, through their intermediaries, also made last-minute changes,[12] and gave feedback about the services they received.[13] They determined when, and whether, to pay their service providers.[14]

Mr. Mones was also not "leading" or "organizing," within the meaning of Section 3B1.1 because the decisions he made were not the "exercise[] of decisionmaking authority" consistent

---

[11] These chats are voluminous; we attach hereto as Exhibit 15 an excerpt of one such chain between Mr. Mones and Armando Salazar, who requested flights on Lopez Bello's behalf. In a fashion that is typical in the chains, *see also* Ex. B to G. Br (Ramirez Camacho chain with Mr. Mones), Salazar gives orders like "Hi, bro. Passenger to Maiquetia [Venezuela] today, plus the uncle's mother," (Ex. 15 at 26), "Bro, the uncle's leaving tomorrow at 6 p.m. from Maiquetia [Venezuela] to Punta Cana," (*id*. at 32"), and "I'm letting you know about a flight the uncle [Lopez Bello] needs tomorrow," (*id*. at 36). Salazar specifies the number of passengers and forwards the passports of the travelers' passports. *Id.* at 25-29, 34-35, 39, 43-44. He asks Mr. Mones to arrange to buy electronic cigarettes (specifying the flavors) and whiskey for his clients. *E.g.*, *id.* at 24, 48. For his part, Mr. Mones says he is "work[ing] on it" (*id.* at 38), confirms that the requested flight has been arranged (*id.* at 50), and reports on whether and when the passengers left or arrived (*id.* at 45-48)).

[12] *E.g.*, *Id.* at 33 ("Give me a moment, because there was a change"); *id.* at 47 ("Bro, let's push it back to 9 p.m.").

[13] *Id.* at 42 ("The uncle [Lopez Bello] is very excited"); *id.* at 43 ("No worries, it's really awesome.").

[14] *See* discussion *supra* at 13-14 of Mr. Mones' chats with Morales and Ramirez Camacho seeking payment.

with greater culpability and a higher Guidelines range. *See* U.S.S.G. § 3B1.1, n.4 & Backgr.  No

less than defendant Atilla the deputy bank manager, he was implementing decisions made by his

bosses.[15]  None of the cases cited by the government say otherwise, because each involves leaders

of businesses where the business is either the locus at which the crimes were perpetrated or a co-

equal with others at the top of the conspiracy's hierarchy.[16]  Put another way, the government re-

casts the shape of this sanctions evasion solely to shoehorn it into a line of caselaw in which

leadership enhancements were imposed, based on readily distinguishable facts.  In *United States*

*v. Weaver*, 716 F.3d 439 (7th Cir. 2013), the Seventh Circuit described the perversity of the logic.

"Indeed a borrower would not describe her loan officer as her 'manager' or 'supervisor' simply

because the loan officer imposes a credit limit, dictates the interest rate and loan term, advertises

for costumers, and refuses to be available on weekends." *Id.* at 444.

---

[15] *See Attila* Tr. at 10:19-11:14 (imposing a minor-role adjustment despite supervision of others because defendant was "following orders in large measure" from the bank manager); *see also United States v. Murad*, 954 F. Supp. 772, 788-89 (D. Vt. 1997) (defendant was not a "leader" or "manager" although he directed others to divert assets and hide records, because "within the context of the conspiracy" he acted at the direction of others).

[16] *See United States v. Huerta*, 371 F.3d 88, 92 (2d Cir. 2004) (defendant was president of an independent laboratory that tested blood samples and submitted claims to Medicare that falsely associated the samples to Medicare beneficiaries); *United States v. Duncan*, 42 F.3d 97, 106 (2d Cir. 1994) (defendant was president of a real estate development corporation that was "the primary vehicle" through which "corrupt payments and bribes were made," and "knew of and profited from [the] corruption"); *United States v. Spencer*, 129 F.3d 246, 249 (2d Cir. 1997) (defendant barred from involving himself in debtor airline laundered airline's payments to him and concealed his involvement in the airline); *United States v. DeRiggi*, 72 F.3d 7, 8 (2d Cir. 1995) (defendant was "the highest ranking authority at the inspection station" of the Taxi and Limousine Commission where line inspectors and supervisors accepted bribes to rig inspections); *United States v. Ashubi*, No. 07 CR. 1008-01 RWS, 2008 WL 4449340, at *3-5 (S.D.N.Y. Oct. 1, 2008) (defendant was the owner-operator of a deli who gave cash to customers in exchange for food stamps for a share of the cash proceeds and directed his employees to engage in the fraudulent transactions); *United States v. Wisniewski*, 121 F.3d 54, 58 (2d Cir. 1997) (*per curiam*) (the defendant was the owner of a car dealership whose clientele included drug dealers, who, together with salesmen he hired and supervised, engaged in money laundering by selling cars to drug dealers who paid in cash).

Mr. Mones also is uniquely disqualified from being a "leader" or "organizer" ████████ ███████████████████████████████. The "nature of [Mr. Mones'] participation in the commission of the offense," (U.S.S.G. § 3B1.1 app. n.4), was not that of leading but the opposite one of undermining. Also, Mr. Mones neither profited nor stood "to gain the most from the financial success of the scheme." G. Br. at 26. His (uncollected) fee was a 10 to 20% commission. Mr. Mones did not "recruit"; the government presents no proof that he talked anyone into joining the evasion scheme.[17]

Despite the government's manipulation of the facts to show otherwise, Mr. Mones was at most an average participant, a broker. *See United States v. Burgos*, 324 F.3d 88, 90 (2d Cir. 2003) (reversing three-level enhancement because broker of stolen checks could as easily have been found to be serving the co-conspirator bank employee who stole checks as the other way around).

## IV.   Mr. Mones' Crimes Must Be Considered In The Context Of His Life And Other Mitigating Factors

A sentence of 28 months' imprisonment would be warranted based solely on the considerations discussed above. The USPO recommended a sentence principally of 30 months' imprisonment *after* imposing a four-level leadership role. The sentence of 29 months' imprisonment is the average imposed in all of the surveyed cases within a five- or ten-year period. Mr. Mones' case, however, presents additional mitigating circumstances, many of them unique.

---

[17] The government's claim that Mr. Mones' "recruitment" of Leon before it became illegal to provide services to El Aissami and Lopez Bello (G. Br. at 24-25, 29-30), is incoherent. Other wrong assertions are: (1) that by merely charging five or more individuals the government has shown them to be knowing participants (*id.* at 24); (2) that Orsini Quintero was an "employee" of ACS (*id.* at 25-26); and (3) the repeated confusion of Mr. Mones' commission of bad acts with proof that he led or organized others in the commission of the crimes (*id.* at 2, 26) (referring to organization of flights only outside the United States, use of code names, falsified flight manifests, receipt of payments from front companies, etc.).

### A.   Mr. Mones Has Led An Otherwise Honorable Life and Will Never Again Commit a Crime

It is mandatory to consider the defendant's history and characteristics and to put the defendant's "immediate" crimes into "the context of" the defendant's "overall life." *United States v. Adelson*, 441 F. Supp. 2d 506, 513 (S.D.N.Y. 2006). Here, that overall life is exemplary, and Mr. Mones will not commit another crime. The government has no rejoinder other than to baselessly denigrate the many who wrote letters supporting Mr. Mones.

The government's assertion cannot undo or reduce the record of a half-century of Mr. Mones' life which was entirely honorable and focused on promoting the safety and well-being of his family, friends, and colleagues. Mr. Mones has been a loving son, husband, and father. He lived the immigrant dream of building a new life in America and obtaining college educations for his daughters. He has a truly extraordinary record of good deeds done for family and friends and as acts of charity.

Friends and family from all periods of Mr. Mones' life, and from Venezuela, the United States and other countries, have written to vouch for his life and for their continued support of Mr. Mones. *See* Exs. A and B to ECF No. 180. Counsel obtained and could have submitted another three dozen letters; they were not different in their sincere praise of Mr. Mones' values and his character and their confidence in Mr. Mones' remorse and his ability to learn from his mistakes. The corrections officer who volunteered to write on Mr. Mones' behalf also obviously found it worthy to note to the Court Mr. Mones' character, humility, and his capacity for self-examination. *See* Ex. B to ECF No. 180, Ltr. 16 (Alexander Martinez).

Because the COVID-19 restrictions will prevent Mr. Mones' friends and family from traveling from Florida and other far-flung places to attend his sentencing in person, we annex as an addendum to this brief photographs of the individuals who would attend if they could. Exhibit

16 includes signed statements from letter writers (as many as the defense could gather in the time available) affirming that the government had no basis to impugn the sincerity of their letters and that they have truthfully expressed their feelings and support for Mr. Mones.

While the government dismisses even the possibility, the record of Mr. Mones' life shows that he is a good person who chose a terrible path when OFAC designated El Aissami and Lopez Bello.  As the USPO found, Mr. Mones' history and nature should weigh strongly in his favor.

**B.**     ████████████████████████████████████████ **Shows He Was Not Disloyal To The U.S. And Did Not Undermine U.S. Interests**

As discussed above, it is undisputed that the ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



This circumstance is mitigating.

**C.  The Extreme Conditions Of Mr. Mones' Confinement, And His Model Conduct As An Inmate, Weigh In Favor Of Leniency**

In keeping with immoderateness of the rest of its positions, the government maintains that serving time during over a year of lockdowns, including for the COVID-19 pandemic, should be deemed no different than being incarcerated in ordinary times.

First, the government is wrong to cast doubt that Mr. Mones contracted COVID-19.  G. Br. at 47 (saying Mr. Mones "apparently" contracted the virus).  BOP records the prosecutors obtained for Mr. Mones show that Mr. Mones was assessed by MCC medical personnel on April 6, 2020 for suspected COVID-19, based on complaints of "cough, fever, chills at night, loss of appetite and taste for last 4-5 days."  *See* Ex. 17 (typos in original record corrected).  Mr. Mones' illness was only deemed "resolved" on April 20, 2020.  *See id.*  The MCC also moved Mr. Mones into "isolation" in the interim.  The only reason the MCC did not confirm the COVID-19 illness its personnel assumed was that the prison was not testing inmates at the time.

Second, labelling the steps taken by the MCC as "reasonable" and "temporary" (G. Br. at 47) does not remotely rebut that the inmates have endured "dreadful," "unsafe," "inhumane," and "arduous" conditions, ones "no one would wish . . . on any other human being," to use just some of the descriptions used by a broad swathe of judges in the Southern and Eastern Districts about the MCC and MDC.  D. Br. at 5, 30-31, and n.39 (collecting cases).  An inability to receive a single family member for over a year, or suffering from a life-threatening illness without access to any care other than over-the-counter medications, or having to review 6.7 terabytes of late-produced

government discovery via short and sparsely granted telephone and video calls, is more onerous, distressing punishment than the usual term of incarceration.[20]

Mr. Mones' sentence should reflect that he has already served the equivalent of a longer term than one measured in the usual way, by calendar time.

### D.     Mr. Mones' Help In Exposing Mr. Marin Supports A Downward Variance

Whether considered as a part of Mr. Mones' "history and characteristics" (G. Br. 48) or any other part of the broad sentencing calculus permitted by Section 3553(a)(1), the help Mr. Mones lent in exposing Mr. Marin as a liar was unique, valuable, and deserving of credit.  The government does not—and cannot—deny how rare and exceptional it is for it to charge and arrest one of its own sources.  Mr. Mones' questions exposed a source on whom the government had relied for three years, cornering Mr. Marin so that he brazenly lied to agents and AUSAs.

The government also carefully omits mentioning that in posing his questions, Mr. Mones corrected an inexcusable, consequential government error.  The case agents should have realized on the very same day Mr. Marin completed flying the July 2018 illegal bulk transfer that hundreds of thousands of euros had gone missing.  The prosecutors should have realized the same thing as

---

[20] The cases cited by the government are again inapposite.  Among other things, each addresses the different question of whether the defendant had shown "extraordinary and compelling reasons" warranting compassionate release from the remainder of a term previously imposed.  *See United States v. Camacho*, No. 13 Cr. 58, 2021 WL 260122, at *1-2 (S.D.N.Y. Jan. 26, 2021) (denying release to 32-year old and robbery crew member who committed a crime "replete with the potential of lethal violence" and had served 96 months of his 250-month sentence); *United States v. Darge*, No. 10 Cr. 863, 2020 WL 3578149, at *1-2 (S.D.N.Y. July 1, 2020) (denying release to defendant who had served around 9½ years of a 30-year term and had been convicted of "a brutal double murder, committed in connection with a large-scale drug transaction"); *United States v. Zubiate*, No. 18-cr-442, 2020 WL 312788 at *1, 3 (S.D.N.Y. June 12, 2020) (denying release to defendant who sought release from "nearly three-quarters" of his term of 102 months' imprisonment, imposed for "engag[ing] in a substantial narcotics business, [and] trafficking in large quantities of heroin laced with deadly fentanyl, as well as cocaine").

soon as they saw the agents' reports and photos of the cash transported.  Had this happened, Mr. Marin would have been timely confronted in July 2018, and the course of this case would have been far different.  Mr. Mones would not have had to chip away at Mr. Marin's credibility in dozens of calls and emails with the AUSAs over a period of four months.  The time and the massive resources the government expended in initially digging in to defend Mr. Marin's reliability, and then serially disclosing terabytes of discovery impeaching Mr. Marin, would have been saved.

Mr. Mones deserves credit for exercising the diligence the government did not.

### E.     Extraordinary Burdens Have Already Been Imposed By The Government's Late Discovery Productions

The government's position that its 16 late productions of discovery cannot have imposed any prejudice on Mr. Mones—and further that it was Mr. Mones' choice to "strategically" adjourn his sentencing (G. Br. at 49-50)—is another example of failing to "own" its mistakes and "rectify" them in a way that serves justice.  *See Nejad* Op. at 16 (quoting *Berger*, 295 U.S. at 88 ).

First, it is specious for the government to assert that it cannot imagine how the making of 16 serial discovery productions, of the equivalent of billions of pages of documents, over a five-month period *after* the defendant has pled guilty, could possibly result in litigation expense beyond the expense imposed by timely, consolidated discovery before the defendant's plea.  G. Br. at 49.  The very nature of electronic discovery is searching performed against a universe of documents; when that universe is released in dribs and drabs the work and expense multiplies and prior analysis becomes superseded.  The government also well knows that any investigation is impeded and slowed if facts cannot be taken into account earlier and as part of a whole picture, but instead become available later and incrementally.  Mr. Mones suffered more burdens than continuously "re-do-ing" his reviewing and analysis of documents and information.  In the end, he had to "re-

do" his case, losing one of the prime advantages of pleading guilty promptly—the saving of expense and distress due to a quick, efficient proceeding.

It is blame-shifting and victim-blaming, moreover, for the government to say that it was "strategic" on Mr. Mones' part to adjourn being sentenced to await discovery. G. Br. at 49-50. It was the government's failures to timely investigate the reliability of Mr. Marin that put Mr. Mones in between the "rock and the hard place" of waiting to see how badly Mr. Marin would be impeached or proceeding to sentencing as scheduled. The government also produced serially and over a period of months basic discovery items like AUSA notes of debriefings of Mr. Marin, or conspirator chat chains, because of failures in this case like those that have also come to light in other cases, like *Nejad*—inadequate collection and incomplete reporting from investigating agencies, inadequate prosecutorial supervision of case agents, and inadequate and tardy searching by the prosecutors of their own files.

As it must, the government concedes that the very voluminous information it late-produced was devastating to Mr. Marin and correspondingly of "benefit" to Mr. Mones. G. Br. at 49-50 (Mr. Marin's discrediting "eliminated a key witness" against Mr. Mones). It should concede the clear consequence of its late productions—that Mr. Mones was fundamentally prejudiced thereby.

## V.     No Fine Should Be Imposed

In seeking a "substantial" fine of between $25,000 and $5 million dollars (G. Br. at 50), the government again ignores proportionality and the substantial burdens imposed by its own conduct.

It is exceeding rare for courts to impose fines in sanctions cases at all. In the ten-year survey, in only nine of 45 cases was a fine imposed. The highest amount was $100,000, while the rest did not exceed $50,000. *See* Ex. 11.

Mr. Mones has also already been financially punished, to an unusual degree. The two final PSRs in this case show that as a result of COVID-19 and the calamities associated with losing his business, Mr. Mones' total assets declined in value by over $4.3 million dollars between March 2020 and now. *Compare* March 2020 PSR at p. 21; Feb. 2021 PSR at p. 23. The USPO had recommended a fine of $1 million in the first PSR; in its latest PSR it recommended an amount of $250,000. *Compare* March 2020 PSR at p. 28; Feb. 2021 PSR at p. 28.

Mr. Mones has already paid at least the equivalent of that amount in covering the attorney and expert time and costs imposed by the government's 16 late discovery productions, the motion practice engendered thereby, and the costs of preparing serially for two pleas and sentencing. In addition, Mr. Mones has lost his livelihood and that of his family, and he will likely lose his professional licenses. As the PSR indicates, *See* Feb. 2021 PSR at p. 23, Mr. Mones' family is now covering their monthly living expenses with the assets that Mr. Mones has left. No fine should be imposed because Mr. Mones has suffered ample financial punishment already.

## CONCLUSION

The Court may consider the principle that "non-violent first offenders whose only real victims are themselves"[21] can be justly punished and rehabilitated without lengthy prison terms. Mr. Mones is shamed and sorry for his crimes, he will never commit another one, and he is not a danger to the community. There is no necessity, as Section 3553(a) requires, of imposing on Mr. Mones a term of incarceration longer than 28 months' imprisonment, and for that reason Mr. Mones respectfully requests that that sentence be imposed.

---

[21] Hon. Raymond Dearie, *Retool Mandatory Sentences*, New York L.J. (June 24, 2016), available at https://www.law.com/newyorklawjournal/almID/1202760853093/; *see United States v. Booker*, 543 U.S. 220, 245 (2005).

Dated:    March 10, 2021
          New York, New York

Respectfully submitted,


_____
Christine H. Chung
CHRISTINE H. CHUNG PLLC
14 Murray Street, #236
New York, New York 10007
Telephone: (917) 685-0423
christine@thechunglawoffice.com


_____
Samidh Guha
George M. Barchini
PERRY GUHA LLP
35 East 62nd Street
New York, New York 10065
Telephone: (917) 674-5383
sguha@perryguha.com
gbarchini@perryguha.com


*Attorneys for Defendant Victor Mones Coro*